UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| UNITED STATES OF AMERICA | Case No. MJ 21-64-GF-JTJ |
|---|---|
| V. | |
| MOISES ZAMORA | |

**AFFIDAVIT OF RYAN KACHER
IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Ryan Kacher, having been duly sworn, hereby depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of a criminal complaint to arrest Moises Zamora (year of birth: 1984; hereinafter ZAMORA). ZAMORA is a Hispanic male who has family on and recently resided on Rocky's Boy's Indian Reservation in Box Elder, Montana.

2. Your Affiant is a Special Agent of the Federal Bureau of Investigation (FBI) and has been so employed since October 2014. Your Affiant is currently assigned to the Havre Resident Agency of the FBI's Salt Lake City Field Office. Your Affiant has experience investigating violent crimes, murders and attempted murders. Your Affiant graduated from the FBI training academy in Quantico, Virginia, which provided training in interviewing and interrogation techniques, arrest procedures, arrest warrant applications and various other criminal laws and procedures.

3. The statements contained in this affidavit are based upon your Affiant's investigation, training and experience, and was obtained with the assistance of other sworn law enforcement officers whom your Affiant believes to be competent and reliable. Because this affidavit is being

1

submitted for the limited purpose of securing an arrest warrant, your Affiant has not included each and every fact known concerning this investigation.  Your Affiant has set forth only the facts that your Affiant believes are necessary to establish probable cause to support an arrest warrant based on ZAMORA's violations of 18 U.S.C. §§ 1152 and 113(a)(1) – Assault with Intent to Commit Murder and 18 U.S.C. § 924(c)(1)(A) – Use of a Firearm During and in Relation to a Crime of Violence.

4. According to 18 U.S.C. § 113, whoever is guilty of an assault with intent to commit murder shall be imprisoned not more than twenty years.  According to 18 U.S.C. § 924(c)(1)(A), whoever discharges a firearm during and relation to a crime of violence, including assault with intent to commit murder, shall be imprisoned for at least 10 years to life.  This affidavit will demonstrate there is probable cause to believe ZAMORA, knowingly assaulted John Doe with the intent to commit murder and that he used and discharged a firearm during the assault of John Doe, year of birth: 1977, an enrolled member of the Chippewa Cree Tribes of the Rocky Boy's Indian Reservation, around midnight on September 25, 2021.

## PROBABLE CAUSE

5. At approximately 1:16am on September 25, 2021, I received a call from the Rocky Boy Police Department (RBPD) on Rocky Boy's Indian Reservation (RBIR) advising that there had been a shooting on the reservation and RBPD Officers were in pursuit of the suspect.  I learned that the shooting occurred at or near 35 Riverview Drive, which is the address of a residence within the exterior boundaries of RBIR.  Without unnecessary delay I got into my FBI-assigned vehicle and traveled in the direction of that location.  While en-route to that location I maintained contact with RBPD dispatch and learned that the pursuit was still on-going and dispatch had temporarily lost communication with officers involved in the pursuit.  I was eventually able to

make contact with an officer of RBPD and learned that the pursuit had ended at a remote location on RBPD, described as Bowery Peak.

6.     I arrived at Bowery Peak at approximately 3:01am.  I recorded the approximate GPS coordinates of the location where I observed law enforcement vehicles staged as 48.1781662, -109.6885742.  I was directed to continue down the road where after approximately one quarter mile I arrived at the main scene of the resolution of the pursuit, which was at or near the summit of Bowery Peak which is within the exterior boundaries of RBIR.  I observed law enforcement vehicles from RBPD and from Hill County Sheriff's Office.  I also observed a white Dodge truck which appeared to have been parked haphazardly at the end of the road.  I looked through the driver-side window of the vehicle and observed in plain-view what appeared to be balls and shards of crystal meth spread across the driver's seat.  I observed the rear driver-side tire of the Dodge truck had fallen off the wheel.

7.     I consulted with other law enforcement officers about the sequence of events of that morning.  I was told that RBPD received a call of a shooting at the aforementioned address.  I learned that RBPD Officers responded to the scene where John Doe had been shot.  Officers were given a description of the vehicle in which the shooter fled after shooting John Doe.  I came to understand that at least one of the Officers departed the scene to look for the suspect vehicle, while others remained to process the scene, assist the victim, and collect evidence.  Officers who remained on the scene recovered what was described to me as three 9 mm cartridge casings.  I learned of the identity of John Doe and that Officers observed blood, coming from his mouth.  I learned that he was rushed to the hospital in Havre, Montana, and was then life-flighted to a hospital in Great Falls, Montana.  I learned that the Officer who went to look for the suspect vehicle located what appeared to be the suspect vehicle at or near the D&L Bar in Box Elder,

Montana. This Officer remained within his vehicle and radioed for backup. The driver of the suspect vehicle apparently became concerned about the presence of a law enforcement vehicle and began to flee before backup had arrived and before the Officer attempted to stop the suspect vehicle. The Officer pursued the suspect vehicle and eventually apprehended the driver and lone-occupant of the vehicle at the previously described location.

8. After collecting this information, I requested RBPD Officers to seal the white Dodge truck with evidence tape and to take photographs of the truck. We then made arrangements for a tow-truck driver to tow the Dodge truck to a secure location. I instructed RBPD Officers to maintain sight of the truck from that time until it was left in a secure law enforcement facility. I instructed RBPD Officers who had been involved in the investigation to prepare their reports. I then proceeded to interview the driver of the Dodge truck inside my FBI-assigned vehicle, along with RBPD Criminal Investigator Steven Corcoran.

9. Before asking any investigative questions I advised ZAMORA of his Miranda Rights which he voluntarily waived by signing an FD-395 Advice of Rights form. ZAMORA identified himself by name and date of birth. ZAMORA said that he was under the influence of drugs but that his mind was clear enough to have a conversation and he wished to continue questioning. I observed that ZAMORA was responding to my questions in a reasonable manner and was communicative and I therefore determined to continue with the interview. ZAMORA explained he was on RBIR visiting his family. He had been there for a few days. He said the white Dodge truck belonged to his mother, Aurora. ZAMORA stated he did not know anything about someone being shot that night and that he did not know anything about methamphetamine in his vehicle. He stated the vehicle had also been driven by his sister and brother-in-law. ZAMORA said there was methamphetamine in his pocket at the time he was arrested which belonged to him

but he did not know anything about the methamphetamine in the truck. I questioned him about how his truck ended up where it was. He said, "I took off." He then explained that he was driving when he got a flat-tire in the mountains, he turned around and the cops were behind him. He did not know if he was being chased. He said he first got in the car at a gas station in "maybe" Box Elder. He said a friend of his brought the truck to the gas station. He did not remember details about who the friend was or anything related to how or why his friend came to be at the gas station with his car. At the conclusion of the interview ZAMORA was transported to the Hill County Detention Center by a Hill County Sheriff's Deputy.

10. Later that morning I went to Northern Montana Healthcare, the hospital in Havre, Montana where John Doe was initially transported. Employees of the hospital directed me to several bags where John Doe's clothes and personal belongings were held. I observed that much of his clothes were soaked with blood. I observed a gun belt with live .22 caliber long rifle rounds and an empty gun holster among his belongings.

11. In the early afternoon of September 25, 2021, I went to the RBPD Police Station and observed the aforementioned suspect vehicle in a secure law enforcement facility and the evidence tape which had been used to seal the vehicle previously was still intact. I photographed the vehicle and, with the assistance of another RBPD Officer, proceeded to search the vehicle. After consultation with prosecutors at the United States Attorney's Office in Great Falls, Montana, I used the motor vehicle exception to search without a warrant. During the search I recovered crystal meth, live .223 caliber ammunition, a spent .40 caliber casing, and drug paraphernalia. I also observed and photographed documentation, associating the vehicle and contents of the vehicle with ZAMORA and members of his family.

12. After searching the vehicle I was introduced to an individual (Interviewee 1) who was a resident of RBIR, was related to ZAMORA and had been living with him prior to the shooting, and who was in the vicinity of the shooting at the time it occurred. Interviewee 1 stated he had been with ZAMORA during the day prior to the shooting. ZAMORA told Interviewee 1 he had been getting high. Later that evening ZAMORA got into a verbal altercation with some individuals in which racially-based insults were exchanged. Interviewee 1 went to sleep that night and was later woken up by a neighbor saying John Doe had been shot and ZAMORA shot him. Interviewee 1 said a couple of weeks before the shooting, ZAMORA showed him a 9mm Taurus handgun. It was a small black handgun. ZAMORA also drove around with Interviewee 1 and told him if he got pulled over he was not stopping. ZAMORA drove a white Dodge Ram that was missing a headlight. Interviewee 1 did not witness the shooting but was familiar with those who were awake and / or present at the time. Interviewee 1 directed myself and CI Corcoran to the other witnesses.

13. I then conducted interviews with three other individuals who were familiar with ZAMORA. Two of the interviewees did not witness events but were in the vicinity and heard three gunshots then found John Doe with apparent gunshot injuries. One interviewee, Witness 1, ZAMORA's nephew, was present during the shooting and described events as follows:

    a. Witness 1, ZAMORA, and others were hanging out after dark the night of the shooting. John Doe was not present. Witness 1 was drunk at this time. Some of the individuals, including ZAMORA, left the group. At one time John Doe came on horseback. He was on his way to "the wake." [Note: I understand a wake to be traditional Native American funeral ceremonies.] Witness 1 and John Doe continued to engage in casual conversation for approximately 30 minutes, no one

else was present during that time. ZAMORA then drove up in his white Dodge Ram with a missing headlight while Witness 1 and John Doe were talking. Witness 1 asked ZAMORA, "What's going on?" ZAMORA replied, "Hey, get out of the way real quick." Witness 1 got out of the way, looked away, then heard "Pop Pop Pop." ZAMORA shot John Doe. ZAMORA then drove away in his truck. Witness 1 stated that there were no acts of violence, aggression, or other forms of provocation between ZAMORA and John Doe at the time just prior to the shooting.

I presented a driver's license photo which I had obtained of ZAMORA to Witness 1. Witness 1 looked at the photo and said that was ZAMORA "100 percent."

14. On September 26, 2021, I spoke with a medical professional caring for John Doe at Benefis Hospital in Great Falls, MT. I was informed that John Doe is currently on life-support and it is possible that he may still die from his injuries and a recovery at this point is not likely.

## CONCLUSION

15. Based on the foregoing information, there is probable cause to believe that ZAMORA is in violation of 18 U.S.C. §§ 1152 and 113(a)(1) – Assault with Intent to Commit Murder and 18 U.S.C. § 924(c)(1)(A) – Use of a Firearm During and in Relation to a Crime of Violence. Your Affiant swears this information is true to the best of his knowledge and belief. I therefore respectfully request that a warrant be issued for his arrest.

_____
Ryan Kacher, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO before me this 26th day of September, 2021.

_____
Hon. John Johnston
United States Magistrate Judge